Good morning, Your Honors. May it please the Court, my name is Rosario Rodriguez, and I'm here on behalf of the petitioner, Ms. Rosario Hernandez Garcia, and her two children, who are also the writers on this petition for review. As an initial matter, I'd like to request two minutes for rebuttal. There is one central issue in this case, and this is whether or not the harm that petitioner Rosario Hernandez suffered was on account of her actual or imputed political opinion. To reverse the BIA's finding that Ms. Hernandez did not demonstrate a nexus between the harm she suffered and the protected ground, the evidence must not only support that conclusion, but compel it. The evidence in this record both supports and compels a finding that the harm suffered by Ms. Hernandez was, in fact, on account of her actual and imputed political opinion. Ms. Hernandez Garcia is a native and citizen of Guatemala. She entered the United States on June 21, 1996. She left Guatemala because she feared for her life. Her father was a member of the Guatemalan military, so were her two brothers, her father-in-law, brother-in-law, and husband. Ms. Hernandez testified credibly at her immigration hearing that since she was a little girl, her father received numerous threats from the guerrillas because of his support for the Guatemalan government as a member of the military. She testified as to three attempts at burning her family home, the third one resulting in the actual burning of her home. Her father passed away of a heart attack as he faced the destruction of his home. Ms. Hernandez also testified that when she was a young girl, her father received notes threatening the family. She could not recall how many because her father would hide these notes. The notes received by Ms. Hernandez's father mentioned her father's name along with members of her family. Ms. Hernandez also testified that her husband was taken from their home and killed. Her husband was on leave from military and visiting his family when mass men entered their home and took him away. Three days later, they found him nearly dead. He later died in the hospital. Counsel, do we have any evidence that the mass men who came in were guerrillas? I've read her testimony. I know that she says that, but is there any evidence of that? There is no evidence, and I understand the court's position and the government's position. I think that in light of the testimony and everything that Ms. Hernandez went through, there is no other explanation for who those mass men could be other than guerrillas. If we look in the context of when these acts occurred, the fact that her family was well involved with the military, the fact that this is even if they were guerrillas, that wouldn't necessarily tell us that this was on account of political opinion. It may have had an economic component to it to support their activities. She says, well, the guerrillas have now turned into gangs, and says she fears the gangs if she goes back to Guatemala, and that suggests more of an economic motive than a political motive. What evidence do we have? Can you give me any evidence that there was a political motive here? Well, I think she credibly testified, Your Honor, that she was a member. I mean, her family was seen as supporters of the politics of Guatemalan government. Her whole family was basically involved in the military, which in that time frame, being involved in the military was essentially supporting the government. Was that voluntary, or was her husband conscripted? It's not part of the record, Your Honor, but from my personal knowledge, I believe it was voluntary. Her whole family voluntarily served in the military in Guatemala, although I do know that that was never elicited in testimony. I think, Your Honor, that the main focus of this case should be the fact that the totality of the circumstances, every factual basis of this case, would only point to one reason, and that being a political opinion. This court, in Connors v. INS, I believe, has previously held that where there appears to be no other logical reason for persecution, then it's got to be based on a political opinion. Can you tell me how long between the last event affecting her family members, her brother, her husband, how long then before the attack on her? It had been two years, Your Honor. I believe her husband died in 1992, March 13th of 1992. She was raped May of 1996. But in the interim, she received numerous threats at her home. Her testimony stated that she received anywhere from three to four hundred anonymous letters. Were any of these notes signed, or any indication from whom they came? No, Your Honor. They were not signed. They were anonymous. However, there is something that was never brought up either by the BIA or the IJ. It was that these notes specifically addressed similar threats that she had received as she was a child when her father was personally named in the notes that she received as a child, where they basically said, well, burn down your home, we will kill you, we will get rid of you, and is essentially what they ended up doing in the past. So her fear, again, was that this could happen again. And it was very similar in tone, the types of threats that she received in that time frame. Your Honor, we also want to point out that this Court has in other cases found that the nexus requirement can be established by something other than specific identification of one's persecutors, and that is, for example, in Canales-Vargas v. Gonzalez, the Court stated that the case law does not require a victim of past persecution or an applicant fearing future persecution to marshal direct evidence of the persecutor's or would-be persecutor's identity or precise reason why she has been or would be a target of persecution. In that case, I believe, you know, the Court was looking at a person who had at one point did a speech in Peru against the Shining Path. Three weeks later, she received anonymous notes that she would be threatened with death, that she was threatened with death. Later, this Court found that that was significant, even though she couldn't specify, even though the notes were anonymous. There's also Lopez-Golarza, another case where this Court found that the circumstances of a physical mental abuse create a strong inference, unrebutted by contrary proof that this abuse was premised on Lopez-Golarza's perceived political opinion, political opposition to the Sandinista regime. Now, one thing that the BIA did in this case was compare the present case with the Salaya v. Mukasey, which is, I believe, the most recent case in addressing these types of claims. Now, in Salaya v. Mukasey, the Court looked at four specific factors to determine and to distinguish this case from the Ochavez, I think the Ashcroft case, and they looked at four factors. In the Salaya case, the NPA members who kidnapped and raped the petitioner in that case knew her father since she was a small girl and had actually come to the home when she was a small girl. The NPA in that case took the petitioner from her home, kidnapped her, later raped her, and after they were ascertained that she was the daughter of the person that they had met initially. Third, they looked at the fact that Rosalina had heard that she was the daughter of the war veteran that she addressed. And fourth, they looked at the fact that the petitioner in that case never conceded that it could have been an act of random criminal acts. In this case, it's far more similar than what the BIA distinguished it as. In this case, again, we have a person who, when she was a child, she was present when the threats came. The guerrillas knew her father since she was a young child. The guerrillas raped Ms. Hernandez at her home in the same town where she had lived when her father lived there. The third thing is that Ms. Hernandez received 300 to 400 threats prior to her rape. This is significant. The board nor the IJ ever really considered that factor. And this is contemporaneous to the rape. Again, the notes address significant similarities between the threats she received when she was a small girl and the threats that she received as an adult. And fourth, and a very important factor, is that she never conceded that this was a criminal act. In fact, she specifically stated in her asylum application, in her interview with the asylum officer before the IJ, and still to this day that the guerrillas were the ones who attacked her and her family. One more other factor that I want to point out before I reserve the rest of my time. You're down to 46 seconds total. So I just want to point out that the other thing that the board didn't look at is the fact that every other factor in this case points to only one person, or only one group, and that is the guerrillas. There were multiple acts of violence against Ms. Hernandez and her family. Thank you, Your Honor. Thank you. May it please the Court, David Wetmore for the Attorney General. As a threshold matter, Judge Bybee was correct. There is no evidence in the record that would compel a finding that the tragic incidents that happened to the petitioner were on account of a protected ground. There's frankly no evidence in the record that what happened to her was on account of her political opinion, which she asserts. Petitioners failed to raise in her brief or argue in any way that it was on account of her membership in a particular group, a particular social group. She does say it's because of her family being in the military. That's correct, Your Honor, but it's entirely speculative. When we look at her testimony and the reasons why she believes it was on account of her family's in the military, which she also would share that characteristic with thousands of other individuals in the country of Guatemala, she states when asked why she believes it's the guerrillas, she says, well, supposedly it was the guerrillas because they're the only ones to harm people over there. That testimony frankly and directly conflicts with the evidence that's in the country reports, that Guatemala is overrun with criminal activity. She even admits as much that multiple different groups are committing these crimes in her own testimony as well. What inferences can be drawn from the fact that she was receiving these threatening notes and that they seem to be similar to those she received when her family were active in the military? I'm glad you pointed that out, Your Honor. To the extent that counsel asserted that the IJ or the board failed to consider these notes in either of their decisions, those issues are not before the court. The only decision before this court is the board's decision. Therefore, anything that was not raised in the appeal to the board, petitioners failed to exhaust her administrative remedies with regard to those findings, and they're not before this court. What did she raise to the BIA? She raised to the board her imputed political opinion, Your Honor. And when we look at the circumstances here, they almost line up exactly with this court's decision in Ochave. That decision was issued in 2001. Judge Fernandez was in the majority on that decision. In that decision, a woman in the Philippines was raped. She said it was on account of her father's participation in the government there and that Marxist rebels imputed political opinion to her. This court found that there was no nexus between that they imputed no political opinion to her when these individuals encountered her daughter and her along the road. They made no references to her by name. In this case, the alleged assailants in the 1996 rape made no reference to petitioner by name. As in Ochave, there was no reference by the attackers to any family members that participated in government activities. Here we have no reference to any attack based upon individuals' membership in the government or the army. They made no reference in the 1996 attack to any prior attacks. They didn't name the petitioner. And when they left, they only told her, don't tell the police. The record shows that there's ample evidence of banditry, gang activity, and crimes committed on numerous other potential grounds other than political opinion. And when we look at the record here, it's bereft of anything that would show that this was on account of her political opinion rather than just horrific street crime in Guatemala. And when she cannot show that it's on behalf of one of those five enumerated grounds, which she cannot show here, the court must dismiss the petition or deny the petition for review because substantial evidence in the record just simply does not show or compel the finding that it was on behalf of one of those enumerated grounds. We can also look at the temporal distance between the two alleged attacks. Even in the attack that occurred on her husband on March 9th of 1992, that occurred at her location with her father-in-law's house. That house was located over eight hours by bus from the home in which she was living with her mother when the rape occurred four years later. In both instances, masked men broke in. She said she assumed that they were the same men, but there's no evidence in the record that she recognizes individuals. In fact, she conceded that she did not. There's also no evidence that they identified themselves in any way as rebels. In the other cases, even in Ochave, where the court found that there was no nexus, the victim in that case, the alien, clearly recognized these individuals as rebels. They had come down from the mountains and were committing basically banditry, various crimes. Here there's absolutely no evidence that these individuals wore anything identifying themselves as rebels. They were simply masked men committing horrible crimes. What did the threatening notes say? Nothing in the record indicates what the exact verbiage in these notes were. The only thing we know is that the notes were anonymous. They never named petitioners specifically. She did testify that some of the notes prior to her father's death, which occurred on July 25, 1990, which was two years prior to the attack on petitioner's husband and six years prior to petitioner's rape, that some of those notes may have, in fact, named her father, who was serving in the military at the time. But the other notes, we have no idea whether they were on account of any sort of political opinion, whether they were just threats against people in the village, whether it was economically based, whether it was just a shakedown, or whether it was just bad people saying bad things to people. We have no idea. There's nothing upon which we can conclude that these notes that came into petitioner's mother's home were on account of her political belief, her mother's political belief, or any imputed political belief. And it's clear from the record that petitioner has admitted that she's never been active in any political organization. She's never spoken out on any political issue. Frankly, there's no evidence that anyone would impute any sort of political opinion to her.  Apparently, they said that people would be killed or burned is what petitioner testified to. But again, there was nothing in the record to indicate that they were on behalf of any sort of imputed political opinion. And at the time petitioner's attack occurred in 2006, her father had been dead for six years. That house apparently had burned down, so it's unclear whether they were even the same house that they were living in. Petitioner had lived with her husband for over three years in a town that was eight hours by bus away. So there's really no temporal connection that would indicate that the only reason upon which these things would be occurring, the only possible explanation could be that there was an imputed political opinion. In fact, the record really indicates, and petitioner concedes, that Guatemala is rife with criminal problems, gang problems. She conceded that she does fear the gangs. She also conceded that she was aware of the 1996 peace accords that took place during which the various warring factions in Guatemala decided to cooperate and essentially eliminated any sort of rebel problem. So any speculation with regard to a fear that she has going back and fearing these rebels just simply is eviscerated by these changed country conditions. Does the court have any additional questions? Thank you, counsel. Thank you. Ms. Rodriguez, I think you used most of your time. I will afford you another minute if there's anything you'd like to tell us in response. Thank you, Judge. Yes, I just wanted to point out a couple of things, and that is that the government wants to box this issue into it being just a simple criminal act of violence. However, the petitioner in her testimony clearly stated that she had no other problems with anybody else other than guerrillas in her whole life. She never testified or conceded that this was a random act of violence. Again, throughout her whole testimony, throughout her application, she always singled out one particular group, and that was the guerrillas. I think that to ask the petitioner to bring evidence of who exactly raped her would be contrary to this court's findings in previous cases where the court doesn't expect one's persecutors to hand over some evidence so that they can come back to the U.S. and prove that this is, in fact, who was persecuting them. Other than that, Your Honor, thank you for your time. Thank you. We thank both counsel for the argument.
judges: Fletcher B. , Fernandez, Bybee